The Court is aware that this is a case that comes to you after a criminal trial in the U.S. District Court for the District of Maryland in which some novel issues were presented. In fact, only the second time a criminal case has been brought against a cardiologist in connection with his treatment of patients, more particularly the implantation of stents in coronary arteries. The challenge that the District Court faced in this case, and we faced as litigants, frankly was that because this is only the second time this kind of a case has been brought to a federal court in this country, there were challenging issues with regard to the way the health care fraud statute applies to this kind of conduct. As the Court is aware, the health care fraud statute generally punishes a scheme and artifice to defraud anything related to health care benefits. Through the years, cases have developed the idea that intentional medically unnecessary services can violate that statute. Our position before this Court, however, is where the issue of medical necessity is not defined by any stated law, but is simply the result of professional practice and dictated by guidelines of that practice, where there's a lack of clarity and a difference between experts. That kind of standard is, to say the least, an imperfect fit for a criminal prosecution of this type. We suggest that it renders this statute as applied in this case impermissibly vague. The challenge for anyone in a vagueness case, of course, is to show this Court how it is that someone would not be aware of when their conduct violates the law. But a review of the record in this case shows that there was a great deal of difference of opinion between the experts as to what the community standard of care was. As a practical matter, various experts testified to different things during the trial. The government's lead expert, Dr. Gilchrist, for example, came into the trial saying 70%  but through the trial then seemed to change his position to anything 50% or greater. The government's response to that, of course, is the conduct here, according to their view, is that Dr. McClain's conduct was so far outside the bounds that this is not an issue. But the Fifth Circuit recently, in addressing a similar claim by Dr. Patel, ruled that there were serious concerns around the parameters of the way the statute works in punishing a physician who has breached a medical standard involving coronary heart treatment, particularly where in that case, frankly, the Fifth Circuit declined to make a ruling because they found there was evidence in the record that Dr. Patel, the defendant in that case, understood that 30% or less was inappropriate dissent based on his own testimony at trial. Here that issue lived entirely in the dispute between the experts. May I ask you this question about that argument? Does it go to the first aspect of the charge in this case, that is, that knowingly and willfully executing attempt at the scheme and artifice to defraud and obtain by to wit, by submitting insurance claims for unnecessary stints that he performed, period? Doesn't that go there? That's correct. It does. Why can't the government prove in the disjunctive and didn't the court allow that and wouldn't it be sufficient to have proved that he did unnecessary testing procedures or he falsely documented records and wouldn't the conviction stand then? Well, the answer is yes, they can prove in the disjunctive. Let me explain how I would answer those concerns, Your Honor. First is that the tests the government claims were improper were largely tests that were derivative of the stint that was placed in the first place. So the reason they were unnecessary is because the stint was not necessary and therefore the follow-on testing related to anyone who then has a stint was also unnecessary. And so I believe that the testing issue in this case dovetails with that first principle. Let's assume that it does, that in fact the testing was necessary. If you had left that out of the indictment, it still would be legally sufficient if they proved that he knowingly performed unnecessary tests, even if they were related to what were admittedly necessary stintings, wouldn't it? Well, I guess what I'm saying, Your Honor, maybe I'm not being clear, is that I don't think the question here is whether the testing was necessary if the stint was necessary, but only that because the stint was unnecessary, all the follow-on testing should never have taken place. That wouldn't even apply, would it, to the last aspect of the disjuncted charge, and that is by falsely documenting the record? That's correct. That would be an entirely different basis for sustaining the conviction if it were proved beyond a reasonable doubt, would it? It would, but again, the determination of what is false here once again turns on the angiogram. So in this case, what the government claimed all along was the falsity, as is included in the other counts of the indictment, the violations of 18 U.S.C. 1035, relates to the idea that there is a substantial overstatement of the blockage and that that is a material statement. And the materiality, it seems to me, Your Honor, turns entirely on what the underlying medical standard is. Obviously, if someone is saying 80% when the blockage is 60%, but it is entirely appropriate to bill for and conduct an intervention when that person is at 60%, while there may be something that is not accurate, I would suggest to you it's not going to be material for purposes of the way the health care fraud statutes work. And so we believe these are connected issues and that one important point in all of that, of course, is when the jury is left to determine all of these issues, it is confronted with the odd scenario in which it is both trying to determine what is, in fact, illegal, and then once it does that, whether the conduct violated whatever standard that is. That's a fairly unusual situation in this kind of case. Most of the time, the issue is not if you cross the line, is it illegal? I mean, that's what juries find. The line is here. Here, the question is where is the line? And then, was it crossed? And there simply was no record content that really gave the jury any meaningful guidance other than the disparate positions of the experts. Your Honors, I want to move on to some of my other issues. First and foremost, there was a significant issue that came up after trial that was brought as part of a new trial motion seeking to point out the government's failure to disclose a confidential regional medical center, the hospital involved in this case, and which implicated, at least in the press release the government put out, the conduct of three of its witnesses who were senior medical staff at PRMC. This was a situation where these witnesses testified at trial at some length. One of them was a critical expert for the government. And throughout this period of cross-examining these witnesses, we were deprived of the opportunity to challenge them about their role in the case based on the government's view, which was not disclosed to us, and more importantly, which the government indicated when talking with the district court in response to its questions, the reason for nondisclosure was a concern about the impact the disclosure would have on the public and jury selection, suggesting in our mind that the government understood this was important information that could have a material impact on the trial. And yet, knowing those things, it was not turned over to us and not usable at trial. We sought a new trial. We obviously were turned down by the district court, and so we're raising that issue here. Again, given the importance of expert testimony in this trial, which was really where the crucible of the trial occurred, I think it can't be gainsaid that we're in a situation where the ability to raise bias concerns on the part of the only government expert who testified that more than 100 of these procedures were improper is a real challenge for us and something that definitely prejudiced not only our trial, but also the outcome of the trial. Keep in mind, as the court's aware in our brief, we talk a lot about the fact that both of these issues, which again turn on what the experts are saying, place Dr. McLean's conduct in a situation where he is being viewed as having done certain things outside the bounds without reminding anyone that 85% of the time the government's expert agreed that he got it right. And so one of the issues here, of course, from a sufficiency perspective, is was a sufficient pattern proven to show that this was intentional conduct? And when you look at more than 700 stents that the government offered evidence about, there were about 100 that were problematic, about 15%, and that that ratio in essence aligns with this national study, the Chan study that came out just before trial, suggesting that the nationwide error rate of inappropriate stenting is somewhere around 12%. And our suggestion here is, again, given that this is a novel case, we haven't been here before, what we believe is going on is that Dr. McLean is being pulled out and prosecuted, and I understand the government has the authority to do that. However, when you're being prosecuted for conduct which isn't inconsistent with the conduct of cardiologists based on studies done on a nationwide basis, we have to wonder what drives this case. How do we know that this was in fact intentional as the government suggests and proved and what the jury found, when in fact the evidence to the contrary is substantial, given that it doesn't appear that Dr. McLean was a significant outlier? In addition, the government proved the case in part through relying on pure comparison evidence, the idea that Dr. McLean was stenting at least arguably more patients than others. But when you looked at the top 25 stent providers in Maryland, Dr. McLean was stenting 16 out of every 100 patients in his practice, and as a ratio, that placed him at the bottom of the list, not anywhere near the top, and so there clearly are people who were doing stents at a higher rate in their practice, in addition to his rate being consistent with what we saw in this nationwide study. Wasn't the study for a different time period than was involved here? It was in fact, and in fact what's interesting about that is that the, if anything, the practice around the later period in the study should have suggested we would have seen a lower inappropriateness rate because of increasing medical technology, because of increasing coalescence around a higher standard, but when you go back to the time when Dr. McLean was practicing from 03 to 06, which was at issue in this case, actually there was a more lenient standard generally when it came to when a stent was appropriate, and it's only as time has gone by that we've gotten more conservative as a result of something called the COURAGE trial. Was that in evidence, that there was a lenient standard? Well, what was in evidence was the idea that there was a 50% standard that over time, an event called the COURAGE trial. I'm not, sorry, I'm not talking about the standard, I'm talking about the percent of, you're complaining about something that, a study that you offer for the purpose of saying he was within the acceptable range of cardiologists for that area, right? That's correct. I'm talking about their decisions to place the stents, i.e. the error margin, the aberration  That's right. And you say it was prejudicial error to exclude that evidence, while at the same time the government was offering evidence that said he was stenting more than most people in the area, right? Well, they were attempting to do that, their evidence didn't in fact show that. Isn't that your argument, though? That is our argument. Well, what's the significance to that argument, if that study is for a different time frame than the doctors was being charged with making the improper conduct? What's the difference? The significance is that testimony at trial provided by our experts suggested doctors were more likely to stent in the period that Dr. McClain was operating than they were in the period of the study. And so if anything, we would expect, although we don't have a study that was done at that time, that there was a higher rate of inappropriate stenting at that period of time than what was going on at the time of the study that we dealt with. But again, the issue of being able to introduce and deal with the study raises the last point I want to talk to you about today, which relates to the limitations placed on our expert testimony at trial. Now, admittedly, the district court and I saw differently regarding the sufficiency of the disclosure that was made. That's obviously in the record, and we've cited to it in the brief, and the court has an opportunity to look at it.  We've seen deposition of that witness, and despite sort of being given full disclosure and an opportunity to ask any and all questions, there were still several respects in which the district court limited Dr. Marmer's testimony. Most specifically, the study that Judge Payne mentioned. In addition, the inability to address patients other than the five that were in the indictment. And then perhaps most significantly, from my perspective, any effort to address a community standard of care, which is largely well known in malpractice cases, but which the district court simply would not allow Dr. Marmer to address for these purposes. Obviously at the core of the defense here was, is this a crime or is it malpractice? To the extent that you're dealing with a doctor in a cath lab, deciding to place a stent, obviously they can sometimes not be the best doctor. But that doesn't make them a crook. And here, that was sort of where the trial lived, and the inability of the defense to use its expert to address all those points, and more importantly, to rebut the government's evidence on these points. And the failure of the government to sort of see that there really is no surprise in most cases where you're talking about rebuttal evidence. And yet, nonetheless, there was a very active effort to limit Dr. Marmer and to keep his testimony out of the record. And I think given the importance of the expert testimony in this case, that put Dr. McClain at a significant disadvantage that affected his rights to a fair trial. This is a case where I think the other important thing for the court is to look at all these pieces together. We're dealing with a novel legal theory, something that has not really been addressed by any court before, an unknown medical standard that was not known to the defendant prior to his acts, because it's not fixed anywhere, and something that Medicare has never chosen to speak on, despite, obviously, cardiologists doing these procedures every day in America. For all those reasons, we believe that a reversal of this case is appropriate. Thank you. Thank you, Mr. Wilkinson. Mr. Wesley? Ms. Wilkinson? Good afternoon. May it please the court, Sandra Wilkinson on behalf of the U.S. Attorney's Office, and I'm with here . . . with me here today is my co-counsels in the trial below, Mr. Crooks and Mr. Corcoran, and we're here today to defend the careful and considered verdict of a jury that sat through ten days of testimony in this case, and the thoughtful and careful and thorough reasoning of a district judge who made very conscientious, well-reasoned, and pointed decisions, both as matters of law and as matters of evidence. It's a little broader than that, though. This case is a case that brings a lot of challenge, and one we have to be very careful about. I want you to address those. We're talking about potentially making malpractice, potentially, a crime, because the line is in terms of . . . because a lot of this is statistic, is when you do the stinting. In any of your evidence, did it weigh in . . . did it account for a cardiologist that's been practicing 20 years, in terms of errors, versus one that's been practicing five years? Is there any sensitivity in that? Because that's what you're doing. You basically put a case together that said, based on the standard of practice, these errors suggest . . . not only suggest, but beyond a reasonable doubt, show that this person was a criminal, not a practicing physician making mistakes. Was your statistic sensitive to how long you've been practicing cardiology? That seems like a question more aptly addressed to my colleague on the other side, Your Honor, because this . . . Just stop with me asking you. Well, except that this case, Your Honor, is about a three-year time period where Dr. McClain's stinting practices hit a sharp spike in the number of procedures for which he was deciding that a stint was appropriate in patients, and most importantly, where he became known, according to the trial testimony, as a McClain 90-percenter, where he was lying affirmatively in his medical records, demonstrating a higher percentage of stenosis than even his own expert was stating at the time of the trial testimony. So what he did prior to buying his condominium in Ocean City in 2004 was irrelevant in this case. What came out, Your Honor, is that in this time period, that Dr. McClain had chosen to increase his billables by lying on his medical records, having patients come in for catheterizations based on nuclear stress tests, looking at their catheterizations and deciding in the lab that he was going to place stents, knowing that that would create an opportunity for him to continue them as patients in his practice for the following years, that he would put standing orders in place to continue testing them at a rate that was off the charts. Did cardiologists know that you were going to have to follow these people up? I mean, don't cardiologists always follow people up? And they do so with different degrees of regularity, depending upon their assessment of how bad the problem is. They don't put standing orders in place, Your Honor, that says we're going to have a nuclear stress test every four to six weeks, three months after that, six months after that, and 18 months after that. These are the tests where you walk on the treadmill, and they're not necessary after you put the stent, which is what is supposed to increase the flow of your heart. They're not necessary to have a stress test after they put a stent in? Not in the frequency that Dr. McLean was ordering that wasn't based on necessity, but was based on a standing order guideline in his office. You will come in every four to six weeks, every three months, every six months. There was a lot of dispute about whether it was a standing order or not, wasn't there? I don't think there was evidence in the record to suggest that it wasn't, Your Honor, except for argument of counsel, because there were witnesses who testified from Dr. McLean's office who said exactly that was the case, and an auditor from the case agent who testified about the records that showed exactly that pattern of testing. The problem is, counsel, though, when you talk about standing orders, some physicians are more conservative than others. For example, you're right. You could do it case by case more, but a cardiologist looking at the panoply of cases, I'd rather be certain and be conservative and say, listen, I'd rather have some regularity on standard order. But you're right. Almost every standard order, everyone is not going to need it, but standing orders stay in place because of the conservative idea that let's make sure, because there could be some cardiologists who see people do stress tests, and they do those things, and people say you're fine, you don't need a stent, and then six weeks later, they die of a massive coronary. And because of those things, they say, listen, I'd rather take the chance of being a little more conservative. When you do that kind of thing and make it a crime, aren't we in a dangerous area? Your Honor, in this case, for example, as we set forth in our brief, Dr. McLean would order 10 EKGs in a three-year time period for patients that came in post-net. Your EKG doesn't change like that, and the only evidence in the record is Dr. Gilchrist saying that that is unnecessary, and the most important part to remember as part of this case, Your Honor, because we are not criminalizing malpractice here. This is a fraud and false statements case. The victim in this case was Medicare, Medicaid, and other insurance companies who only pay for what is reasonable and medically necessary. And you can go back and look at Dr. Marmer's testimony, who was the defense expert in this to suggest that any of the tests that Dr. McLean had done of the five or six patients he testified about were reasonable and medically necessary. What he wanted to- What was your evidence about that? It seems to me that you have the burden of proving that. What was your evidence? Absolutely. Well, it was all of the witnesses in this case, Your Honor, starting first with Dr. Gilchrist, and Dr. Gilchrist described when it is necessary to put or consider putting a stent in a patient. And the most important concept is that stents are not to prevent heart attacks. They are to relieve or alleviate symptoms that a person is feeling as a result of 70% or more blockage, making an hourglass in your artery such that the blood flow isn't better. So people will- Let's assume that the stent's not put in. Do you know what happens then? If the stent doesn't come in, your body adapts to it. If a stent isn't put in, do you know what happens to that blockage? It gets bigger. And you know what happens when it fills up the artery? You have a heart attack. That's precisely why they put stents in, is to prevent heart attacks. There's no other reason to put them in. Your Honor, respectfully, that is not what the testimony was said, but remember what a stent is for. A stent is for when you identify a specific minutia in a particular artery in your heart. Remember, though, there's a ton of arteries in your heart. And a lot of the places, you're going to have rust or arthrosclerosis in all of your arteries. And a heart attack is caused in an acute event when one little piece drops into the bloodstream and blocks that artery, so you have a heart attack. It is like a lottery to pick when a piece of that fatty tissue, that lesion, falls into an artery and blocks the heart. Stenting is not about that. Stenting is about you're having problems breathing. You tell your doctor you have chest pains. He goes in. He sees the one place where he can open it up a little bit so the blood flows better. It is not about the former. And that is exactly what Dr. Gilchrist, who was there right now. And that's what your expert testified to? Absolutely, Your Honor. When you read Dr. I'm going to tell you one thing. I don't want that doctor practicing on me. Well, Your Honor, I don't know how to. If you read Dr. Gilchrist, he is a very skilled doctor. And remember here, it's not just Dr. Gilchrist, it's other doctors from PRMC, doctors that testified at this trial who found that every one of the particular patients that Dr. McLean was stenting or calling as 80% to 90% blocked were not reasonable and medically necessary to stent. And remember what stenting does, Your Honor. Stenting is, as Dr. Gilchrist explained, it adds a foreign object into the body and creates sometimes more problems than it fixes. Because stenting is not a, it is not meant to be a band-aid, it is meant to help a specific area of your artery to help open it up and help alleviate symptoms. It is not, if you, it makes you more at risk to have additional stents. Some of Dr. McLean's patients had eight, nine stents in them, full metal jackets, Your Honor. They would be on Coumadin for their whole life. Stenting is not the cure to heart disease. Diet and exercise is the cure to heart disease. Stenting is- You're really giving us a medical lecture here? As Dr. Gilchrist did, but hopefully I was answering the questions, but- What would really, at least for me, and I don't know if you still have, if you're still having that sense that you'd gone a little bit afield from that. And I'm sorry about that. No, no, that's okay. What would be helpful? I think we have to view the evidence in the most favorable to the government, but I think a really fair question has been raised here between the difference between malpractice and criminal behavior. So why don't you then narrow the body of evidence, because you have a very wide body of evidence that goes from 70% down to zero. Narrow, and give us the government's best evidence that's in the record that supports the decision. Well, first of all, this case has strong similarities to the Patel case that the Fifth Circuit just affirmed on the same- Okay, but now I'm talking about the record in this case. Absolutely. And there's a lot of comparisons between that case, but this is what happened in this. These are the evidence of the fraudulent conduct by Dr. McClain in this case. Between 2003 and 2004, Dr. McClain had a financial motive to increase his billables at his hospital, at his practice. We see a sharp spike in the number of patients that he is deciding to stint. We see a sharp spike- Now you say financial motive. You said he bought a condominium. What else? I mean, a lot of people buy condominiums. That's certainly true, Your Honor, but that was the primary motive that we introduced here, that it increased as of- A sharp spike- ... last year. Does that mean that I'm about to do something? It just- Of course not, Your Honor. I'm just suggesting that there isn't, as Judge Quarles found, an element of greed here or of a need to have a discernment. I'm giving you factors of the fraudulent intent here. And we see a pattern. Come 2006, it is off the charts in the kind of lies that Dr. McClain puts in his medical records. Not only lies about the percent of stenosis, where he is finding 80 to 90% routinely of these patients, reaching a crescendo in that summer period of 2006 when the hospital looked looking at him. But Dr. Gilchrist testified that these are patients, some of which had zero blockage. 10% blockage. That's what I think we should be concentrating on in this record rather than- Thank you, Your Honor. So I looked at the government's exhibit G9, which the jury saw, and which is part of our joint appendix. So there are probably 50 to 54 out of the 59 patients that Dr. Gilchrist testified are in this category. And when you say this category, what category? Meaning the category of McClain 80 to 90, Gilchrist 20, Gilchrist 25, McClain 80, McClain 80, Gilchrist 10, Gilchrist zero, Gilchrist 10, 10, where we're barely seeing any, if any, stenosis at all in the place where Dr. McClain decided to put a stent. And routinely, because that was what Mr. Kenlon testified at trial, who was a catheterization nurse in the lab watching what Dr. McClain did, the nurses did not see the blockages that Dr. McClain was putting in there. And they testified about that too. And he came to be known as the McClain 90 percenter, seeing things, putting things in the record that weren't there, that are lies. And goes to Judge Payne's comment to Mr. Westling on the third prong or the third to wit clause of our indictment, this is about false statements in medical records case at the end of the day. It's about lies that were told by Dr. McClain. And even more pronounced came out through the cross-examination of Dr. Marmer, where we see the fact that Dr. Marmer would say, if you're going to put a stent, and it's in a borderline range, you must have a stent plus symptoms. And no symptoms were reported by the patients that he put stents in, yet those symptoms were of chest pain were put in the discharge papers after Dr. McClain had made a decision to stent them. So their medical records, their patient records, when they came in, why they came to the doctor in the first place, denied chest pain. Catheterization done, stent put in, no blockage that Dr. Gilchrist could see. And then all of a sudden, the discharge paper also has now, the patient has chest pain, adding that key symptom in, which goes to Dr. Marmer's testimony about when you would put a stent in a borderline patient. This is a fraud case at its essence. It's about lies in the patient, things he told his patients that were not true. Well, tell us about the significance of the shredding incident in the record. How strong is that evidence in terms of his- Well, there were thousands, literally, Your Honor, when we did the search warrant, it was at the very beginning of the investigation. A subpoena had gone out for a random sample, I think about 119 patients. And we had gotten evidence or information that Dr. McClain was scrubbing the record, that is, getting rid of patient files. So we got a search warrant from Judge Berdara of our courthouse, go in to do a search warrant. The FBI sees, has Dr. McClain sitting at his desk. The subpoena is open on his desk with the list of patients. And there's an undisputable shred bin next to him. And he is, they are in the order of the patients that are listed on here. And he is going through, and he is throwing original patient records into this shred bin that were subject to the subpoena. Was he observed for a period of time doing this? I wasn't clear on that. Pardon me, Your Honor? Was he observed for a period of time in the process of doing this? Well, the probable cause in the search warrant indicates that it comes from two, I believe, two observations by the archivist who was helping him get his files in order to be saved. Okay. Let me ask you about something different then. Certainly, Your Honor. So that was another aspect of the fraudulent conduct. Right. They're all indicia of it, the pattern, the financial motive, the lies. You know what bothers me about this case? I think, I don't know about saying more than anything, but one thing that really troubled me, has troubled me, is the issue of the handshake settlement and the government's failure to disclose that. And I understand that the settlement didn't protect Dr. Cinderella, that it was only a settlement with the hospital, but what about the coercive effect on government witnesses, knowing that there is this deal, and it's their employer, I presume, or at least some of their employers, some of them's employers, and isn't that something that the defense should have known about and been able to place before the jury, the degree to which the witness's motivation was based on a desire to protect their employer? Okay. First of all, Your Honor, a couple of questions that are thrown into the middle of that. Obviously, we have to look at an eye towards was this material to the jury's verdict in this case. And what happened in this case is that once the press found out about Dr. Cinderella's involvement with the hospital, there was a flurry of activity that year in 2007. And this is relevant for our purposes that the government, at least, believed that the defendant knew that there was litigation out the woodwork in this particular case. Patients were suing him, patients were suing the hospital, they were co-defendants in lawsuits together. There was a million different types of litigation that were at issue here. And that Dr. McClain knew that, which is why I think this civil settlement kind of slipped through the cracks, if you will. I'm not sure I would have written a letter to them that there was a civil settlement. I assumed that they knew that the hospital, just like Dr. McClain, because I was working with my civil counterpart . . . Why would you make the assumption that they would know that? Just because I've done parallel cases, parallel healthcare fraud cases for twenty years, and I don't ever know a case where it's just exclusively criminal, and I was working with my civil counterpart. And frankly, Your Honor, I just assumed they knew. I didn't not disclose it to them. I just didn't . . . I thought they knew. It just didn't show up on my radar screen. So am I hearing you say you probably should have done it, but it wasn't material? I will tell you this, Your Honor. My view of discovery, as the government is, and I know Dr. . . . I know Mr. Wessling will agree to this, is to give open file discovery in this case. In fact, Mr. McClain and Ms. Trolkin came to my quote-unquote war room, and I literally let them read every report that was ever generated by any agent in connection with this case, and all the grand jury gave full at it. So my intention all along was, of course, to give full and open discovery here. And in this particular case related to this, I had concerns, as Mr. Wessling alluded to, and that came out in the post-trial motions that Judge Quarles heard, that the reason why the settlement wasn't disclosed the week before the trial is I was concerned that the jury veneer would take that as prejudicial against Dr. McClain. Because remember what we're talking about . . . But doesn't that speak how important the government thought this evidence could have been, potentially? Important for us, Judge Payne. In other words . . . Well, you recognize there's another perspective to every issue. Oh, of course. And wouldn't it not have been important to the defendant to have known and been able to ask Dr. Gilchrist? He was an employee that was your . . . No, no, no. Not Dr. . . . Dr. Gilchrist was the . . . Who was it again? Chris? It was Dr. Cinderella. Cinderella. Which I will address in a second, but I'm sorry. He was the employee, right? Mm-hmm. And he was a pretty important expert for you, right? He was a secondary expert. Yes, he was, Your Honor. Dr. Gilchrist was our primary expert. Dr. Cinderella was . . . Dr. Cinderella talked about, what, 100 . . . Oh, yeah. He was a fact witness, definitely, because remember what he did. He did this . . . I didn't mean to derail the point. Oh, I'm sorry. But it goes to the relevance of all this, Your Honor. Let me get a record up, though. Dr. Cinderella testified that he had reviewed every stint procedure performed by Dr. McClain from 2003 to 2006 in all 707 procedures, and he ranked each procedure. That's hardly a secondary expert witness. No, my point being, Your Honor, we also had another expert, as Judge Quarles pointed out in this case, but more . . . But experts are allowed to give opinions. That's even more than a fact witness not being disclosed. You're talking about someone who can give an opinion. We don't know . . . Only experts can give opinions as witnesses, and that's the person you don't disclose. But remember, Your Honor, first of all, Mr. Westling's cross-examination of these witnesses, including Dr. Cinderella, who was not a senior staff member of the hospital. Dr. Cinderella had his own practice, and he was part of the hospital's giving review. He was the head of the cardiac cath lab, but he's not an employee of the hospital. He gets a small stipend, I guess you would call it, as part of the trial record, but he really just has his own practice. So doctors will come in and have . . . He's not a senior staff member. Same thing with Dr. Wieland. They don't work or govern the administration of the hospital. They do things like to make sure there's plenty of nurses in the cardiac cath lab, that sort of thing. Dr. Lawrence was a different category, and we'll put him over here. But Dr. Cinderella and Dr. Wieland were just doctors, just like Dr. McClain, who have collateral responsibilities. Sometimes the hospital asks them to do. They were not the senior staff. They didn't get employed by the hospital. They had their own practices. Did they potentially have problems that settlement didn't include them? Well, we have to look at what the record is, Your Honor. There is no evidence here that they were the targets of any criminal investigation, the subjects of any criminal investigation. You didn't give the district court a chance to even . . . Absolutely, Your Honor. Judge Quarles did exactly the right thing in this case. He handled it with the appropriateness of which the court is inquiring now. He held a whole hearing on this, and there was a briefing, and he required us to talk about what the settlement was about, and he made very specific factual findings. And remember, this is a judge who sat through the whole trial, too, and saw the cross-examination of Dr. Cinderella, heard what the defense was in this case, saw the cross-examination of Dr. Lawrence, and determined this was not material giglio impeachment information. He did exactly the right thing in this case. He required us to write a letter about what the settlement was about. He made findings that those doctors were not a party to this settlement agreement. He inquired of what happened below. He did it all under seal, and that's why a portion of the brief is redacted, and then the rest of it, the unsealed portion, is, of course, what Your Honors have access to. Judge Quarles made all those findings, and he decided that this was, and I think appropriately so, not material because, Your Honor, think about this. The fact that Dr. Cinderella found that there were hundreds of stents that were medically unnecessary, how is it relevant that the hospital agrees with that and is going to pay back all that Medicare money? How does that help the defense? How is it exculpatory to the defense that the hospital and the Greeley Company and Dr. Cinderella and Dr. Gilchrist and the nurse whistleblowers in this case, everyone, everyone knew that the stenting practices of Dr. Moline The settlement was with the government, correct? The settlement was between, yes, it was between the hospital, the entity. It didn't admit liability. And the federal government, correct? And the federal government, yes, certainly, Your Honor. And the federal government was bringing the criminal action against Ms. McLean, right? Against Dr. McLean, that is true. Right, and then Dr. Cinderella potentially could have some problems with the federal government? Potentially. Your Honor, there was no evidence that Dr. Cinderella had any problems with it. I didn't say he had any problems. Why was it significant that he was not a part of it? What do you mean? In other words, why would Dr. Cinderella's being disclosed be a big uproar to the public? That's what you said. My point was that Dr. Cinderella had no criminal liability in this case. He was never, I mean, the record is very clear about that. I'm asking you, why did you think that whole thing would blow up and make it difficult to have a fair jury? Oh, because in my view, in my experience, 18 years doing health care fraud cases, Your Honor, the hospital rarely admits that the doctor did something wrong in this case. And in this case, the hospital was saying, you're right, we billed Medicare for what was not reasonable and not medically unnecessary stents, and we did it because Dr. McLean did it. So that component, the hospital component, we are admitting that Dr. McLean did reasonably and medically unnecessary stents, and that's why it's not exculpatory. It's inculpatory. It hurts Dr. McLean that the hospital and doctors are agreeing. Everybody was agreeing. In fact, the only person that seemed to disagree, and remember, he never testified about this, was the paid expert that the defense late disclosed to us two weeks before trial was scheduled to begin in this case. And yet even that doctor could never mumble the words that this were reasonably medically necessary stents, could never say that. Everybody knew. It's almost disingenuous to suggest otherwise. I see my time is almost up, but I want to be able to answer your questions to suggest that Dr. McLean didn't know that he was lying in his patient medical records when he saw. Did you say some of the witnesses were whistleblowers? Well, I'm using that term of ours not as a general term, not as the specific quid tam, but the nurse, Nurse Schellenberg, who actually began the complaint, she complained first that Dr. McLean was not stenting appropriately from her vantage point, and she was a seasoned, experienced Catholic nurse. And if you read her testimony, you'll see that she was quite compelling at the trial. And I see my time is up, but I want to be able to answer any other questions that the court might have. No? Thank you. I'll try to address a few issues that came up during Ms. Wilkinson's argument. I think starting with the nondisclosure issue, since that was the last, it's important for the court to understand that, obviously, our concern is simply that we, even today, don't have really the facts that are behind what was going on there. We know there was a settlement with the hospital. We know that the government purported to tell the public when it eventually made that settlement public that it involved senior staff members. We believe that involves Dr. Lawrence. We also believe it involved Dr. Weiland, who was, I believe, the head of cardiology, and Dr. Cinderella, who was the head of the cath lab, both of which were positions in the hospital. They also had private practices of their own. But as a practical matter, the challenge here is, you know, every lawyer who has to cross-examine a witness obviously probes for bias. What reason does the witness have to testify in the manner in which they're testifying? And our contention here is that because we were unaware of the way the government looked at these witnesses, particularly looked at the hospital, because throughout the trial, in my view, and I think the record supports, the government portrayed Peninsula Regional as though it had done the right thing from the beginning. And then we find out about a settlement, which suggests maybe that's not the case, and, in fact, acknowledges that at least the allegations were such that there was a problem where the senior staff responded appropriately. You saw the settlement agreement, didn't you? No, we did not. You still haven't seen it? We have not. You saw a letter that described it? We did. Based on why in that inquiry that was conducted wasn't the settlement agreement made known to you? Well, Your Honor, what happened was the district court issued a sealed letter to counsel asking certain questions. The government addressed the questions that were asked, and that was really the sum total of the factual portion of that hearing. Were you asked to see a copy of the settlement agreement? I don't know that we made a specific request. We sort of had asked that this issue be raised. Why not? You know, Your Honor, I think I— Well, you shrugged your shoulders. I know that's not helpful to you. The reason is because the way in which the inquiry took place, Judge Quarles issued questions, indicated that he might share the answers to those with defense counsel after he saw them. Once he reviewed them in camera, he did, in fact, disclose them, and that was a day or so before the hearing we had. The point, though, is that—and I'm not suggesting this is a fact, but just hypothetically, if the settlement involved—and I assume you tell me whether or not hypothetically I'm talking— if the settlement involved some errors, I'm going to say errors, of other physicians beyond Dr. McClain, then wouldn't you want to know that? I would, and let me be clear with the court. I don't think that's what the settlement involved. Okay, all right. The settlement dealt with Dr. McClain's conduct and the hospital's role in failing to follow up on that conduct. So that's all—so you're satisfied that's all— Yeah, there isn't a question about what the underlying conduct was. It's simply what—how did the government view these other physicians and whether they reported it or not. Since your interest is narrow like that, Ms. Wilkinson makes a strong point. She says that—how is that exculpatory? Well, I think it's exculpatory because it goes to the ability to impeach these physicians as to whether or not they felt that settlement being successful, which again was held until the end of the verdict, was important in the way they testified at the trial. Well, why couldn't the verdict be supported just based on Dr. Gilchrist's testimony? Let's say we agree with you that you missed an opportunity there. Why would the record not be sufficient based on that? Well, I think for two reasons, Your Honor. The first, obviously, is then you're looking at a sum total of approximately 60 patients, and I don't have the precise number, that he gave specific testimony on, and that's obviously one more sort of function less when you deal with 700 versus 60 as being the error rate. Clearly, pattern must have played a role in what the jury heard. I know you're not looking into the mind of the jury, and I'm not inviting that, but the nature of the evidence is such that it was the repetition the government kept referring to that it seems to me is where the case lives. The other factor is that if you live with Dr. Gilchrist alone, I guess two parts. The first is the patients included in the indictment. We provided expert testimony. We didn't provide it in the way that Ms. Wilkinson provided her testimony, simply indicating that what happened was within the standard of care and that the blockages, according to our expert, were in the 50% range, and so they were in the margin of error. The rest of those patients, what I would argue to the court, is that you'll also note in the trial record and in the briefs, there's a great deal of discussion about the problem of inter-reviewer variability and the idea that one cardiologist seeing an angiogram does not always look at it the same way as another cardiologist. All the experts at trial testified that usually is somewhere between 10% and 20%. There's actually studies that were cited in this case that show that is greater, sometimes up to 45%. Dr. Gilchrist is left there on his own, and we look at his chart. Many times he's calling that a 30% blockage. So if there's a 20% error rate or difference between physicians and 50% is the mark, how many of these are still within that? Are there a handful where there was minimal or no blockage? There are a handful. There's at least one that was specifically charged in the indictment, and we acknowledge that may well be a mistake. But this case derives almost entirely from a pattern, and so Dr. Gilchrist becomes diminished without Dr. Cinderella, and further, I think this problem of the nature of cardiology in this space alone makes that a problem. I realize I'm out of time, so I don't want to exceed. Did the court have any other questions? I'd be happy to address them. I have just a question, just briefly. You mentioned that the error rate for Dr. McLean was 15%, and you said for others it's about 12%. Well, the national study showed a national rate of inappropriate stents at 12%, and if you take 100, which was Dr. Cinderella's testimony of the fives, the worst case, against 700, that's about 15% or 16%. But the problem, though, is that it seemed like their theory is that even if that's so, if they could show that within a tight period of time that error was intensified because of things, wouldn't that be probative to a jury? Otherwise, let's say even if it is that kind of thing, but if most of his errors were concentrated during a period of time when, as they say, it was a motive, I'm not sure how strong it is to have a condo, but a motive, wouldn't that be probative as the jury as to whether or not it was intentional during that period? Isn't that their theory? I think it would be probative. I would suggest to you that we fundamentally disagree about whether the evidence showed any kind of spike. What we know is the government looked at a period of time, 2003 to 2006. I'm not aware of any evidence in the record that was gathered that shows what he was doing before that. And so while there may be a high level at some point where that fits in his overall practice, more than 20-plus years, I can't tell you. Because you didn't put that in. We didn't put it in. We didn't have it, frankly. I mean, these are hospital records. You have to go back and pull the films and that sort of thing. You didn't request it, did you? What I'm saying is that the prior period, from our point of view, was not relevant. The government's now making it relevant by saying, oh, it increased over what he did before, but I'm not aware of what that's based on. It's not in the trial record. They didn't prove what it was before, and then they say it increased? No. What they did prove, to be very fair to the record, is they showed what he did before he was under peer-review scrutiny at the hospital and then what he did after he had a secondary reviewer. But that's different than before he bought the condominium. I agree. And did you say that the study just didn't, that was kept out? Well, let me be very clear. It came in a little bit with their expert because I did it on cross. When I tried to do it with my expert, the issue was that it had not been specifically included in my disclosure and therefore it was excluded. But if you were allowed to ask about it on cross, they opened the door to it. They didn't object to it, and it should have come in. Is that your argument? That's my argument, Your Honor. I see. I just don't understand how they're using hospital physicians to be the metric for the standard for your client is not a community standard relevant in this case. Well, that's obviously a question I'm grappling with, Your Honor. I think the issue here is community and keeping in mind that there have been serious changes in the way this practice has been executed over a period of time akin to what we believe stents do today versus what we thought they did in 2003 and 2004. And doctors' behavior has changed. The medical community has become more conservative. But at this period of time, at least, stents were seen, and I think the record shows this because of testimony from Dr. Marmer about the COURAGE trial, that they did in fact prevent heart attacks. But Dr. Marmer's testimony about what the community standard was, as I understand it, was barred by Judge Quarles because he, Dr. Marmer, based it on what he'd seen one other doctor do or another doctor do. In other words, he held it just wasn't a scientifically reliable opinion and therefore kept it out on the basis of Dover. Isn't that what happened? That was his ruling, and I would suggest to you, Your Honor, and again, if I can just have permission to round out on this question, the challenge there was that Dr. Marmer's testimony was as the director of a New York City cath lab over a period of years, what have I seen and witnessed? And so while that may not be the same specific community, it was not based on a single doctor doing it at one time, but what he sees every day as the cath lab director in a peer-reviewed facility. And with that, unless the Court has any other questions, I thank you for your time. Thank you very much. We'll come down to Greek Council and then proceed to our next case.
judges: Diana Gribbon Motz, Roger L. Gregory, Barbara Milano Keenan, Roger L. Gregory, Barbara Milano Ke